Filed 6/2/25  P. v. Johnson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MONTA JOHNSON,<br><br>    Defendant and Appellant. | D085181<br><br><br>(Super. Ct. No. RIF1901247) |


APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey J. Prevost, Judge.  (Retired Judge of Riverside Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Monta Johnson of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true he personally and intentionally discharged a firearm, causing death (§ 12022.53, subd. (d)). He was sentenced to serve a total of 50 years to life in prison. On appeal, Johnson contends his conviction must be reversed because the evidence upholding it is inherently improbable or physically impossible and therefore insufficient. He also contends the trial court abused its discretion when it failed to dismiss or reduce the firearm enhancement. We reject both contentions and affirm the judgment.

## BACKGROUND

### I.

### *The Prosecution's Evidence*

On March 12, 2019, at approximately 12:15 p.m., deputies from the Riverside County Sheriff's Department responded to a report of an "individual down" at a community park in Moreno Valley. When they arrived, they found Patrick Malloy lying next to his red Ford sedan in the parking lot of the park. He was bleeding profusely from a gunshot wound to the head and later died from his injury at the hospital.

Sandra S. was sitting in her car in the parking lot at the time of the shooting. She told police she saw a burgundy car and a gray or silver car enter the parking lot and park next to each other. After hearing a "big boom" that she believed was a gunshot, she saw a Black man with a bald, shaved

---

[1]    Further unspecified statutory references are to the Penal Code.

head who appeared to be in his 30s get into the car that was parked next to the red car and leave the park.[2]

Deputy Brian Sinclair was in his office at the sheriff's station when he heard the radio broadcast of an "assault with an injury" at the community park at 12:15 p.m. He immediately went to the station's observation room, which was equipped with stations for retrieving and reviewing citywide camera system recordings and began reviewing recorded footage.[3]

From the footage, Deputy Sinclair determined the following events had occurred: At about 11:32 a.m. that morning, Malloy's Ford and a two-door black Mercedes entered the parking lot together and backed into adjacent stalls almost "simultaneously." The Mercedes was later determined to be registered to Johnson.

Both drivers then got out of their respective cars at 11:39 a.m. There was some activity for about three minutes, after which Malloy "ended up" in the Ford's driver seat, and the driver of the Mercedes "end[ed] up just behind [Malloy]" in the Ford's backseat on the driver-side. The two men appeared to settle into these positions for approximately 15 minutes.

At 11:57 a.m., the man in the Ford's backseat stood up, took a couple of steps toward the rear of the Mercedes, and "immediately" turned around and took a couple of steps back to the Ford's "still-open rear door." The man

_____

[2] As we later discuss, Sandra's description was generally consistent with Johnson's appearance on March 12, 2019.

[3] Investigating deputies recovered additional video footage from the Moreno Valley city surveillance camera system as well as private video systems installed on a church across from the community park and two houses on Fir Avenue. The footage was played for the jury, and Deputy Sinclair testified to his opinions of what the footage depicted.

appeared to extend his arm toward the Ford from "about a door length away." He then walked around the back of the Mercedes and got into the driver seat. Within seconds, the Mercedes left the parking lot and traveled westbound on Fir Avenue, away from the park. Deputy Sinclair radioed a description of the suspect Mercedes, including the last three digits of its license plate, to other deputies. From the surveillance footage, it was determined Malloy was shot at approximately 11:57 a.m.

The Mercedes made a series of U-turns on Fir Avenue. It reentered the parking lot and parked several stalls away from where it originally parked. After several minutes, the driver of the Mercedes exited and "positioned himself behind a tree in a planter with a vantage point towards . . . Malloy." Then the driver reentered the Mercedes and left the parking lot, this time going east on Fir Avenue.

From 12:11 p.m. to 12:17 p.m., the Mercedes could be seen driving on nearby city streets. At 12:17 p.m., it went out of view for 10 minutes. At 12:27 p.m., it could be seen driving westbound on Fir Avenue. At approximately 12:28 p.m., the Mercedes drove past the crime scene and turned onto other streets before going out of view again. From 12:31 p.m. to 12:34 p.m., Johnson could be seen walking on Fir Avenue toward the crime scene, arrive directly across the street from the crime scene, and then turn around and walk away.

Around 12:35 to 12:40 p.m., Deputy Josh Patterson and his partner were driving in an unmarked patrol vehicle westbound on Fir Avenue, when Patterson noticed Johnson walking eastbound toward the park. Johnson was looking at his phone and cursing, which drew Patterson's attention. As the deputies continued westbound, Patterson spotted a parked Mercedes that matched the description of the suspect vehicle. Shortly after, Patterson saw

4

Johnson again, now walking westbound.  Johnson continued past the parked Mercedes and briefly went out of Patterson's view.

Deputy Patterson approached Johnson.  He agreed to answer questions and gave Patterson his name, date of birth, and phone number.  Johnson said he was in the area because he was "just being nosy" and was visiting his "side chick."  When asked if he had any keys in his possession, Johnson voluntarily pulled out a Mercedes key fob.  Patterson pressed the button on the key fob, which caused the lights on the parked Mercedes to activate.  As mentioned, the Mercedes was registered to Johnson.  A wallet holding a debit card with Malloy's name was later found inside Johnson's Mercedes.

Johnson was transported to a sheriff's station at about 1:00 p.m.  There, a deputy swabbed his hands for gunshot residue.  A criminalist determined there were four characteristic particles of gunshot residue in the sample taken from Johnson's right hand, which she considered "highly indicative" the particles originated from the discharge of a firearm.  She found one characteristic particle of gunshot residue in the sample taken from Johnson's left hand.  The criminalist explained the presence of characteristic particles of gunshot residue can mean one of three things:  the person discharged a firearm, the person was around when a firearm went off, or the person touched or came in contact with a surface that had gunshot residue on it.

Malloy's Ford was swabbed for genetic evidence.  A DNA analyst testified there was "very strong support"—quantified as 82 million times more likely than not—that Johnson was one of four contributors to DNA collected on a swab of the Ford's rear center armrest.  The analyst stated he could not determine how long the DNA had been on the armrest and

5

acknowledged it could have been there for 15 seconds, a week, or even three months before the shooting.

An examination of the cell phones of Johnson and Malloy revealed the two had been exchanging text messages since December 2017. At the time, both men were employed by the same shipping company. In a January 2019 text message, Malloy gave Johnson his name, date of birth, and social security number. Malloy provided this information after Johnson sent him a text message that said, "What's the deal, Crip? Shoot that info, Crip. Cuz, don't want that free money?"

On the day before Malloy's murder, there was a phone call between Johnson and Malloy. That night, Malloy did Google searches "concerning fraudulent activity" and "being liable for having somebody . . . use your name." One of his searches included the question, "Are you liable for a death that had your name but didn't occur?" And on the morning of Malloy's murder, Malloy texted Johnson, "I'm jumping in the shower and getting ready. What's your timeline looking at?" Johnson responded, "11:00 a.m." They confirmed the meetup location would be Johnson's "casa." Malloy's final text to Johnson was "OMW," meaning "on my way."

A homicide investigator learned that in 2017 and 2018, Johnson had made multiple fraudulent attempts to obtain money using his nephew's name. One of the attempts had been successful, and the nephew had reported the fraudulent loan to the police. In March 2019, Johnson was working for a warehouse company. He had used Malloy's name and identifying information to get the warehouse job. Specifically, when applying for the job, he had used Malloy's social security card, a fake driver's license with Malloy's name but Johnson's face, and W-4 forms filled out with Malloy's identifying information. In addition to using Malloy's information to

6

secure a job, Johnson also had "basically an entire wallet" of documents in Malloy's name.  The investigator opined that Johnson was stealing Malloy's identity and "fraudulently using Patrick Malloy's name in an effort to obtain a financial benefit with regards to a promissory note."

A search of Johnson's residence turned up documents in the name of not only Johnson but also Malloy.  These included correspondence sent to "Mr. Patrick Malloy"; a letter to Malloy, but with Johnson's address; and a letter from a financial institution with Malloy's name but Johnson's address.  The search team also found a driver's license with Malloy's name but Johnson's photograph; a forklift certificate with Malloy's name but Johnson's photograph; and health insurance documents with Malloy's name.

Ammunition of .40-caliber and .38-caliber wadcutter typically used in a revolver were found in Johnson's residence.  A homicide detective testified that a revolver, unlike a semiautomatic firearm, does not eject spent shell casings when it is fired.  No spent shell casings were recovered in this case, either from the Mercedes or from the homicide scene.  However, bullet jacket fragments recovered from Malloy's head wound were consistent with being fired from a .38-caliber, low-velocity firearm.  Additionally, a search of Johnson's iCloud account uncovered a photograph of an individual holding a handgun.  An investigator opined based on "the tattoos" that Johnson was the person holding the handgun.

Last, an investigator forensically examined Johnson's cell phone for cell tower data and records of calls and texts sent and received from midnight until 2:00 p.m. on the day of Malloy's murder.  During that time frame, a total of 202 calls and texts were generated and received by his phone.  But there was no activity on Johnson's phone between 11:49 a.m. and 12:14 p.m.  The investigator found this significant because the gap coincided with the

period before and after the 11:57 a.m. homicide, and it was "a pretty wide gap in terms of [Johnson's] actual usage of the device."

The only location data available for Johnson's cell phone was "general sector information," which was based on the cell tower that was used by the phone to send or receive particular transmissions. The investigator explained that a given cell phone will choose a cell tower "that it feels is the best tower to be able to transmit or receive that data effectively." This "could be a tower that's immediately close to you," or if "the closest tower . . . is being overrun" with cell phone traffic, the cell phone may "pick a tower that is miles away."

From 11:26 to 11:33 a.m. on the day of Malloy's murder, Johnson's cell phone connected with (or "hit") a cell tower 1.3 miles southeast of Johnson's residence and 2.4 miles southeast of the area of the homicide. The homicide scene was within this cell tower's range. At 11:49 a.m. and 12:14 p.m., Johnson's cell phone connected to a cell tower 1.1 miles from Johnson's residence and 2.1 miles from the homicide scene. According to the investigator, "any device can reach that tower from the homicide scene." These two cell towers were the towers closest to Johnson's residence.

At 12:29 p.m., Johnson's cell phone connected to a cell tower located at the park where the homicide occurred. At 1:19 p.m., after Johnson arrived at the sheriff's station, his cell phone once again connected to the cell tower that was 1.1 miles from his residence and 2.1 miles from the homicide scene, even though this tower was "far east of the . . . sheriff's station." The investigator testified this was a "prime example" of a cell phone choosing to connect to "the best tower no matter what," even though the tower was one of the towers furthest away.

8

II.

*Defense Evidence*

Melvin Vance, a defense investigator, reviewed video footage recovered from the city camera stationed at the park where the shooting occurred. He enlarged the images and compared the shooter's appearance to that of Johnson as he walked past the crime scene shortly before he was arrested.

Vance opined that Johnson's skin complexion "appears to be light," whereas the shooter's skin complexion was "dark[ ]." He also opined that the shooter was "heavier" and "darker" than Johnson and the shooter's "walk was totally different from [Johnson's] walk." He also noted that whereas Johnson was wearing a short sleeve shirt and shorts as he walked past the crime scene, the shooter was dressed in a dark-colored jacket, long-sleeved shirt and dark pants. Vance agreed, however, that "[t]he purpose of showing the video to the jury was so that they could look at the shooter and look at Mr. Johnson themselves."

DISCUSSION

I.

*Sufficient Evidence Supports Johnson's Conviction*

"[I]n reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, on review of the entire record in the light most favorable to the judgment, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." (*People v. Young* (2005) 34 Cal.4th 1149, 1180.) We do not substitute our own factual determinations for the factfinder's (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078) because " '[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact' " (*People v. Brown* (2014) 59 Cal.4th 86, 106). We "presume[ ] in support of the judgment the existence of every fact the trier

could reasonably deduce from the evidence. The same standard applies when the conviction rests primarily on circumstantial evidence. Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054 [cleaned up].)

Although he acknowledges the record evidence "has potential to end the analysis for [his] sufficiency of the evidence challenge on appeal in light of the standard of review," Johnson argues there is insufficient evidence to support the jury's finding beyond a reasonable doubt that he was the shooter. This is so, he claims, because "the jury's verdict is based on physically impossible or inherently improbable evidence." We reject this claim.

While an appellate court is authorized to overturn a judgment when it concludes the evidence supporting it is physically impossible or inherently improbable, "such a finding is so rare as to be almost non-existent." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728 (*Ennis*).) This is because, " '[e]xcept in . . . rare instances of demonstrable falsity, doubts about the credibility' " in the evidence are for the jury to resolve, not a court of review. (*Ibid.* [cleaned up], quoting *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) "To warrant the rejection of the statements given by a witness who has been believed by a [factfinder], there must exist either a physical impossibility that they are true, or their falsity must be apparent *without resorting to inferences or deductions*." (*Ennis,* at pp. 728–729, italics added [cleaned up].)

10

"The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying.  Hence, the requirement that the improbability must be 'inherent,' and the falsity apparent 'without resorting to inferences or deductions.' " (*Ennis*, *supra*, 190 Cal.App.4th at p. 729, quoting *People v. Huston* (1943) 21 Cal.2d 690, 693, overruled on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352.)  "In other words, the challenged evidence must be improbable ' "on its face." ' " (*Ennis*, at p. 729, quoting *People v. Mayberry* (1975) 15 Cal.3d 143, 150 (*Mayberry*).)  So "we do not compare it to other evidence (except, perhaps, certain universally accepted and judicially noticeable facts).  The only question is:  Does it seem *possible* that what the witness claimed to have happened actually happened?" (*Ennis*, at p. 729.)  Put another way, testimony may be rejected only when it is "unbelievable per se, physically impossible or wholly unacceptable to reasonable minds." (*Ennis*, at p. 729 [cleaned up].)  Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*Mayberry*, at p. 150 [cleaned up]; see *Ennis*, at p. 729.)

Johnson's attempt to apply the inherently improbable standard comports with none of these rules.  The flaw in Johnson's appellate challenge is that he focuses on asserted conflicts in the evidence, compares the challenged evidence to other evidence to draw contrary inferences and deductions, and tries to persuade us of the ways in which the facts and evidence are consistent with the conclusion he is innocent.  Specifically, he argues it is physically impossible or inherently improbable he was the

11

shooter because: (1) the shooter was dressed in different clothing than Johnson was wearing when he was detained; (2) Vance, the defense investigator, testified the shooter looked different from Johnson; (3) Sandra's description of the shooter "also fit the description of another male" aside from Johnson; (4) "Johnson's cell phone was connecting to a tower closer to his home not the cell tower at the park" when the shooting happened; (5) Johnson could have gotten the gun residue on his hands by touching a surface that had gun residue on it and his DNA could have been deposited in Malloy's Ford months before the shooting; (6) Johnson visited the homicide scene after the shooting and voluntarily pulled out his Mercedes key, acts suggesting it is improbable he was the perpetrator; and (7) text messages showed Malloy and Johnson planned to meet at 11:00 a.m., half an hour earlier than when Malloy's Ford and Johnson's Mercedes were seen arriving at the park in the surveillance footage. With these types of arguments, Johnson fails to persuade us that his is the "rare" case in which the evidence supporting his conviction is unbelievable per se or wholly unacceptable to reasonable minds. We nonetheless address each of his arguments in turn.

First, that the shooter was wearing long sleeves and long pants at the time of the homicide, whereas Johnson was wearing shorts and a t-shirt when he was detained, does not demonstrate the physical impossibility or inherent improbability Johnson was the shooter. This is so even if we accept Johnson's contention that the 10-minute window (from 12:17 p.m. until 12:26 p.m.) when his Mercedes went out of view of surveillance cameras gave him "insufficient time" to "go home, discard his clothes and the firearm, clean up and be back at the park." The contention is unpersuasive, including because it assumes, without supporting evidence, that Johnson's home was the only place he could have changed his clothing (or discarded the firearm). He fails

12

to eliminate other possibilities, for example that he was wearing shorts and a t-shirt underneath the long sleeves and long pants and discarded the outer layers (plus the firearm) somewhere other than his residence. And while Johnson notes that the clothing and firearm were not found in the Mercedes or "along the path of travel of the Mercedes," this also assumes facts not in the record—namely, that deputies did or could search the Mercedes' complete path of travel. Contrary to Johnson's assumption, and as Johnson himself acknowledges, there was a 10-minute period when the path of travel of the Mercedes was unknown.

Second, that Vance believed the shooter had a darker complexion than Johnson or looked different from Johnson because he appeared heavier or walked with a different gait does not demonstrate that it is physically impossible for Johnson to have been the shooter. The jury heard Vance's testimony, inspected the same images and video footage as he, and reached a different conclusion. We have reviewed the photographs and video exhibits transmitted to us at Johnson's request, and agree with the People the images of the individuals depicted in them are not clear. The exhibits do not persuade us the jury unreasonably rejected Vance's testimony.

Similarly, his third argument that Sandra's description of the perpetrator was arguably consistent with another male in the video footage ignores the ways in which it was also consistent with Johnson, whose appearance the jury could see for itself and consider.

Fourth, Johnson's contention the cell tower evidence was exonerating because it showed his phone connected to cell towers closer to his home than to the park at the time of the shooting, whereas it connected to the cell tower at the park when he walked by the crime scene, ignores the prosecution evidence that cell phones do not always connect to the closest cell tower.

13

While the cell tower evidence may support a reasonable inference in Johnson's favor, it does not demonstrate the physical impossibility of the inference against him.

The same is true of the gun residue and DNA evidence, his fifth argument. Johnson focuses on possibilities consistent with his innocence (he could have acquired the gun residue by surface contact; the DNA evidence could have gotten there months before the shooting), while failing to eliminate the possibilities consistent with his guilt (he could have acquired the gun residue by shooting a gun; his DNA could have been in Malloy's back seat because Johnson was the perpetrator seen in the video emerging from Malloy's car just before the shooting).

Johnson's sixth argument is equally unavailing, particularly given the magnitude of his burden on appeal. He asserts that it is "highly improbable" he would return to the homicide scene after the shooting. But it is undisputed the actual perpetrator returned to the scene of the crime almost immediately after shooting Malloy, where he parked the Mercedes and stood behind a tree staring at Malloy. If anything, Johnson's appearance directly across the street from the homicide scene roughly half an hour later, after having parked his Mercedes nearby, is consistent rather than inconsistent with the known behavior of the shooter. And to the extent Johnson points to the fact that he admitted the Mercedes was his and voluntarily handed Deputy Patterson the Mercedes key fob, we reject the notion that it is unreasonable to infer guilt from a criminal defendant's voluntary, otherwise inculpatory admissions. At best these facts disclose "an unusual circumstance," which is not a basis for reversing a conviction. (*Mayberry*, *supra*, 15 Cal.3d at p. 150.)

14

And finally, although it is true Johnson and Malloy's text messages showed they agreed to meet at 11:00 a.m., half an hour before the shooting, the messages also showed the meeting was planned for Johnson's "casa." Although Johnson observes there was no evidence the duo sent text messages agreeing to meet later, he fails to eliminate other alternatives, such as that the duo met as planned and then verbally agreed to go to the park.

In short, Johnson fails to meet his heavy burden to establish this is one of those rare cases in which the facts and evidence upholding his conviction are insufficient because they are physically impossible or inherently improbable. Moreover, the authorities he cites do not persuade us differently. (*Mayberry*, *supra*, 15 Cal.3d at p. 150; *People v. Headlee* (1941) 18 Cal.2d 266, 267–268 (*Headlee*); *Ennis*, *supra*, 190 Cal.App.4th at p. 729.) *Mayberry* and *Ennis* reached the opposite conclusion from the one Johnson would have us reach here, and they did so by rejecting arguments that had flaws like those raised by Johnson. (See *Mayberry*, at pp. 149–150 [rejecting challenge to sexual assault victim's testimony as inherently improbable where the jury "could well have concluded [the victim's] fear was not unreasonable" and that an action assertedly demonstrating the victim's lack of fear "discloses at most an unusual circumstance"]; *Ennis*, at pp. 728–730 [rejecting challenge to sex abuse convictions based on inconsistencies in victim and witness testimony; the inconsistencies suggested only that the jury could have inferred the witnesses were lying, not that it would have been impossible for the defendant to have committed the offenses].)

This leaves *Headlee*, the only case Johnson cites in which a judgment was overturned. However, *Headlee*, which was decided in 1941, is readily distinguishable. There the defendant's challenge was based on a comparison of the statements and actions of a victim who claimed to have been sexually

15

assaulted.  The *Headlee* court noted the victim "[c]oncededly" did not physically resist the claimed assault.  (*Headlee*, *supra*, 18 Cal.2d at p. 274.) It also remarked that "although unmarried" the victim testified "she had previously engaged in acts of sexual intercourse."  (*Ibid.*)  In the Court's view, it was "highly improbable that she did not consent . . . , particularly in view of the fact she offered no objection or resistance."  (*Id.* at p. 275.)  We question whether this antiquated reasoning continues to have relevance today, but whatever force it may still have, we do not find it to be applicable here.

In sum, Johnson fails to establish the evidence and facts against him are physically impossible or inherently improbable, and so we reject his insufficiency of the evidence claim.  Consequently, we also reject his related contentions that his conviction violates state and federal due process because it is unsupported by substantial evidence.[4]  (See *People v. Westerfield* (2019)

---

[4]      In the same section of the opening brief in which Johnson challenges his conviction as based on physically impossible or inherently improbable (and thus insufficient) evidence, Johnson refers to his new trial motion and insinuates the trial court erred by denying the motion.  Johnson does not, however, challenge the denial in a developed argument under a separate heading.  (See Cal. Rules of Court, rule 8.204(a)(1)(B) [an appellant's opening brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].)  And although a trial court's ruling on a new trial motion asserting the verdict is contrary to the evidence (§ 1181, subd. (6)) is reviewed for an abuse of discretion (*People v. Hayes* (1999) 21 Cal.4th 1211, 1260–1261), Johnson does not reference this standard of review or argue that the court abused its discretion.  Any potential challenge to the denial of the new trial motion has been forfeited.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793; see *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 [argument forfeited where it was neither presented under a separate heading nor developed with reasoned argument and citation to relevant authority].)  Still, our determination the evidence supporting the verdict was not insufficient would compel us to reject such a challenge had it been asserted.

6 Cal.5th 632, 713 [under the state and federal Constitutions, a criminal conviction must be supported by substantial evidence].)

## II.

### *The Trial Court Did Not Abuse Its Discretion by Failing to Dismiss or Reduce Johnson's Firearm Enhancement*

The jury found true Johnson personally and intentionally discharged a firearm causing death pursuant to section 12022.53, subdivision (d), and the trial court sentenced Johnson to serve a prison term of 50 years to life, consisting of 25 years to life for the murder conviction plus 25 years to life for the firearm enhancement.

Johnson asks us to remand for resentencing, claiming the trial court violated section 1385 in two ways. First, he claims the trial court was required to dismiss the firearm enhancement because the length of his sentence after applying the enhancement's 25-year-to-life term exceeds 20 years. (See § 1385, subd. (c)(2)(C).) Second and alternatively, he argues the court was unaware of its discretion to dismiss his firearm enhancement under section 1385, subdivision (c), or to reduce it to a lesser firearm enhancement under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*).[5]

---

[5]     Section 12022.53, subdivision (h), gives sentencing courts authority to strike the firearm enhancements. (§ 12022.53, subd. (h) ["The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." ].) In *Tirado, supra*, 12 Cal.5th 688, the California Supreme Court held that sentencing courts have discretion under subdivision (h) of section 12022.53 to strike or dismiss a section 12022.53, subdivision (d) enhancement and impose one of the lesser enhancements in subdivisions (b) or (c) of section 12022.53 even where, as here, the lesser enhancements were not charged in the information or found true by a jury. (*Tirado*, at pp. 696, 700.)

The People respond that Johnson's contentions are meritless as well as forfeited.[6] We agree with the People. Our review is for abuse of discretion. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298; *Tirado, supra,* 12 Cal.5th at p. 694.)

As amended by Senate Bill No. 81 (2021–2022 Reg. Sess.), section 1385, subdivision (c), provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] . . . In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(1), (2).) Subparagraphs (A) to (I) of section 1385, subdivision (c)(2), are a list of mitigating circumstances. Relevant here, one of the mitigating circumstances is, "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(C).)

Johnson contends the mitigating circumstance in subdivision (c)(2)(C) of section 1385 applied to him and required the trial court to dismiss the firearm enhancement because the length of his sentence after applying the enhancement's 25-year-to-life term results in a sentence over 20 years. In his

---

[6] The People's unopposed motion for judicial notice of the Assembly Floor Third Reading Analysis for Senate Bill No. 81 (2021–2022 Reg. Sess.) is granted. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 32 [legislative committee reports and analyses are judicially noticeable].)

18

opening brief, he relied on *People v. Walker* (2022) 86 Cal.App.5th 386, 391, review granted March 22, 2023, S278309, which held that when a listed mitigating circumstance is present, section 1385 "erects a rebuttable presumption that obligates a court to dismiss the enhancement *unless* the court finds that dismissal of that enhancement . . . would endanger public safety." He argued because the trial court made no express finding that dismissal of the firearm enhancement would endanger public safety, the rebuttable presumption was not overcome and the court was required to dismiss the enhancement, and it abused its discretion by failing to do so.

In his reply brief, however, Johnson appropriately concedes his argument has been foreclosed by the California Supreme Court's decision in *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*), which was issued while his appeal was pending. *Walker* held that section 1385, subdivision (c)(2), "does not erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety." (*Walker*, *supra*, at p. 1033.) Instead, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present. . . . In other words, if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.'" (*Id.* at p. 1029, quoting *People v. Ortiz* (2023) 87 Cal.App.5th, 1087, 1098, review granted Apr. 12, 2023, S278894 (*Ortiz*).)

19

After *Walker*, even if we assumed there was no forfeiture,[7] Johnson fails to establish an abuse of discretion on the basis a rebuttable presumption in favor of dismissal mandated dismissal of the firearm enhancement under section 1385, subdivision (c).

Johnson's alternative claim that the trial court was unaware of its discretion to dismiss the firearm enhancement under section 1385, subdivision (c), or to reduce it to a lesser firearm enhancement under *Tirado* also fails. It fails because it is based on the court's failure to expressly address its discretion under section 1385, subdivision (c), or *Tirado*. This argument lacks merit because we do not infer an abuse of discretion from a silent record. The changes in sentencing law Johnson relies on here were introduced in January 2022, a full 21 months before Johnson was sentenced. (See Stats. 2021, ch. 721, § 1 [enacting the changes to § 1385 introduced by Sen. Bill No. 81 (2021–2022 Reg. Sess.) eff. Jan. 1, 2022]; *Tirado*, *supra*, 12 Cal.5th 688 [decided Jan. 20, 2022].) We presume the court was aware of current law in effect at the time of sentencing. "[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 (*Gutierrez*); see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398 ["A trial court is presumed to have been aware of and followed the

---

7      We also assume for the sake of argument that the mitigating circumstance in subdivision (c)(2)(C) of section 1385 is present here. Accordingly, while we acknowledge the People's argument that the mitigator is not present because Johnson's sentence for the murder conviction exceeded 20 years, such that imposition of the firearm enhancement did not "result" in a sentence of over 20 years, we need not and do not address this argument.

applicable law." (Cleaned up.)]; *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517 ["These general rules concerning the presumption of regularity of judicial exercises of discretion apply to sentencing issues."].)

Seeking to avoid the presumption of regularity we must apply on a silent record, Johnson argues the record in this case is not truly silent. He points to his trial counsel's statement—"I know the Court doesn't have any discretion with the life charge"—and asserts that the trial court "did not disagree with defense counsel." Johnson argues, "This leaves [the] question whether the court understood and fully considered the scope of its discretion." We disagree. Under the presumption of regularity that applies to trial court sentencing proceedings, we presume the trial court understood the applicable sentencing laws "[a]bsent evidence to the contrary." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042; *People v. Moran* (1970) 1 Cal.3d 755, 762, citing Evid. Code, § 664.) The presumption of regularity holds where "the record does not establish on its face that the trial court misunderstood the scope of [its] discretion." (*Gutierrez*, *supra*, 174 Cal.App.4th at p. 527.) Even if we were to agree with Johnson that his counsel's statement showed he believed the court lacked discretion to dismiss or reduce the Penal Code section 12022.53, subdivision (d) firearm enhancement, the statement is evidence of counsel's own misunderstanding, not that of the trial court.

And although the trial court did not correct counsel's asserted misstatement, Johnson does not cite a published case, nor are we aware of any, holding a trial court's silence in response to an attorney's error is evidence of the court's own misunderstanding. Instead, the case law is to the contrary. For example, in *People v. Presley* (2021) 65 Cal.App.5th 1131, 1143, the court held the presumption of regularity was not overcome where the judge presiding over a bench trial heard inadmissible testimony regarding

21

the defendant. "That the trial court may have *heard* inadmissible [testimony] does not overcome the presumption that the trial court . . . properly ignored such material." (*Ibid.*) Similarly, here, we presume from the court's silence that it properly ignored the inaccurate statement of Johnson's trial counsel. We also observe that the trial court did not impose concurrent indeterminate terms despite defense counsel's request that it do so, which is an affirmative indication the court was *not* misled by, or under the same misapprehensions as, Johnson's trial counsel.

Johnson also points to the fact the trial court did not make an express finding that dismissal or reduction of his firearm enhancement would endanger public safety, nor did it expressly find aggravating factors neutralized the great weight of the mitigating circumstance. Although this is true, the court's silence does not demonstrate error because express findings were not required. Section 1385 requires courts to provide a statement of reasons for a dismissal. (*Walker*, *supra*, 16 Cal.5th at p. 1036, fn. 6.) However, "the trial court is not required to state reasons for declining to exercise its discretion under section 1385, and is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.)

Further, we agree with the People substantial evidence supports the trial court's implied finding that dismissing or reducing the enhancement would not be in furtherance of justice. (See *People v. Dove* (2004) 124 Cal.App.4th 1, 10 ["If the trial court imposes a prison sentence, we will imply the necessary finding."].) The probation report, which the trial court expressly considered, provided substantial, relevant, and credible evidence of seven aggravating factors and only a single nonstatutory mitigating factor (Johnson's satisfactory performance on probation). The report also expressed

22

concern about Johnson's future danger to the public. In addition to noting the murder "entailed a serious, violent, and vile offense as [Johnson] chose to take the life of [an] unsuspecting victim," the report stated Johnson "poses a reasonable risk to the safety of the community, especially considering that he has been unable to cease his criminality over two decades." Although Johnson argues the report also provided evidence of three additional mitigating factors (the lack of any prior violent history and his own "continuous work history" and family support), he does not contend the report's finding of seven aggravating factors was unsupported. Under these circumstances, we agree with the People the court's implied determination that dismissal of the firearm enhancement would not be in furtherance of justice was within the bounds of reason or not "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Johnson's sentencing challenge also fails for a second reason. Our analysis so far assumes Johnson took the steps necessary to preserve his challenge. However, as the People rightly point out, he did not. Johnson made no reference to the mitigating circumstance in section 1385, subdivision (c)(2)(C), in the trial court, and he did not seek dismissal or reduction of the firearm enhancement under section 1385, subdivision (c), or *Tirado*. Generally, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356.) Johnson's failure to object at sentencing to the trial court's failure to dismiss or reduce his firearm enhancement forfeits his ability to raise his claims of sentencing error on appeal. (*Id.* at pp. 353, 356.) Thus, his sentencing challenge also fails under the doctrine of forfeiture.

In an effort to avoid forfeiture, Johnson contends his counsel was ineffective for failing to seek dismissal or reduction of the enhancement. To demonstrate ineffective assistance of counsel, a defendant "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.) Further, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

We reject Johnson's ineffectiveness claim because he fails to establish that he was prejudiced. (See *Strickland*, *supra*, 466 U.S. at p. 697 ["[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."].) In arguing that he was prejudiced, Johnson asserts that "it cannot be presumed that the court would find that his current dangerousness . . . would persist after 25 years." He refers us to an earlier section of his brief in which he argued that remand would not be futile because the court could reasonably conclude, "in light of [his] prior nonviolent record, its recognition that the evidence did leave at least some question that a third party . . . had been the perpetrator, the potential of this conviction stemming from a dispute specific to the individuals involved . . . , and [his] other mitigating circumstances, that a chance of parole after serving the years imposed . . . would not be a

24

threat to public safety." He asserts that because a parole board would have to approve his release, it is "likely that the court would have dismissed or at least reduced the enhancement."

We are not persuaded. Johnson's prejudice argument focuses on the public safety prong of section 1385, subdivision (c). However, *Ortiz* held, and *Walker* confirmed, that even in the absence of a finding that dismissal would endanger public safety, a trial court retains the authority to decline to dismiss an enhancement "based on circumstances long deemed essential to the furtherance of justice inquiry." (*Walker*, *supra*, 16 Cal.5th at p. 1033 [cleaned up], quoting *Ortiz, supra*, 87 Cal.App.5th at p. 1099, review granted.) *Ortiz* was decided before Johnson filed his opening brief on appeal, yet he did not address this ground for denying relief in his prejudice argument. And as we have discussed, the People argue (and we agree) substantial evidence in the record supports the trial court's implied finding that dismissal or reduction of the enhancement would not serve the interests of justice. Despite the People's argument, in his reply brief Johnson does not attempt to show a reasonable likelihood the court, if prompted by counsel, would have concluded dismissal of the enhancement would further the interests of justice.

Moreover, the individual circumstances Johnson relies on to demonstrate prejudice are not persuasive. To the extent he invokes his prior nonviolent record, his trial counsel invoked this same circumstance during the sentencing hearing to no beneficial effect. Although the trial court, in denying Johnson's new trial motion, stated it did not disagree with defense counsel's assertion there was "some evidence" that would point to a different person being the shooter, the court nevertheless concluded the evidence was sufficient to demonstrate beyond a reasonable doubt that Johnson was the

perpetrator. Given this conclusion, we disagree the court entertained doubts about Johnson's guilt or would or could have relied on any such doubts to lighten his sentence. Johnson's argument that the crime had a motive specific to Malloy (concealing fraud) is not persuasive, because it ignores Johnson's history of fraud and evidence he defrauded others. As for the "other mitigating circumstances" in the record, they appeared in the probation report and the trial court impliedly found they were not sufficient to support dismissing or reducing the enhancement.

Finally, we reject Johnson's argument that "public safety would be protected in any case" because a parole board would have to approve his release. Section 1385, subdivision (c), requires the trial court to make its own determination at the time of sentencing whether dismissal of the enhancement would endanger public safety. Further, the court was presumably aware of the parole procedure and did not view it as a circumstance that supported sentencing leniency.

DISPOSITION

The judgment is affirmed.


DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


RUBIN, J.

26